# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SWISSDIGITAL USA CO., LTD.<br><br> *Plaintiff*,<br><br> v.<br><br>SAMSONITE GROUP S.A.;<br>SAMSONITE LLC; SAMSONITE<br>COMPANY STORES, LLC; and<br>DIRECT MARKETING VENTURES,<br>LLC;<br><br> *Defendants*. | Case No. 1:24-cv-11636-JEK<br><br>**JURY TRIAL DEMANDED** |

**DECLARATION OF JOEL DELMAN IN SUPPORT OF PLAINTIFF SWISSDIGITAL USA CO., LTD.'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING THE CORRECT PRIORITY DATE OF U.S. PATENT NOS. 10,931,137, 10,931,138, AND 11,601,009, AND INVALIDITY OF CERTAIN ASSERTED CLAIMS OF THOSE PATENTS**

## I.    Introduction

I, Joel Delman, declare as follows:

1.    I am the founder and Chief Design Officer at Informed Innovation. My business address is 2176 W 24th Street, Los Angeles CA 90018, and I have been involved in the industrial design field for nearly 30 years. I am over 18 years of age, and I would otherwise be competent to testify as to the matters set forth herein if I am called upon to do so at trial, hearing or deposition.

2.    I have been retained as an industrial design expert witness by Keyhani LLC on behalf of Plaintiff Swissdigital USA Co., Ltd. ("Swissdigital" or "Plaintiff"), to provide my opinions regarding U.S. Patent Nos. 10,574,071 ("the '071 Patent"), 10,931,137 ("the '137 Patent"), 10,931,138 ("the '138 Patent"), and 11,601,009 ("the '009 Patent"), which I may collectively refer to as the "Asserted Patents," and other matters at issue in this lawsuit, Case No. 1:24-cv-11636, *Swissdigital USA Co., Ltd. v. Samsonite Group S.A. et al.*

3.    Counsel for Swissdigital has asked for my expert opinion and comment with respect to Defendants' Motion for Summary Judgment Regarding the Correct Priority Date of the '137 Patent, the '138 Patent, and the '009 Patent, and Invalidity of Certain Asserted Claims of Those Patents (the "Motion").

4.    I understand that my task is to review materials and offer my opinion, perspective and insights regarding this subject.  I hold the opinions expressed in this declaration, which are based on information that is currently available to me.  As my study of the case continues, I may acquire additional information that leads to new insights relevant to these opinions.

5.    With that in mind, I reserve the right to supplement this declaration if and when such additional information becomes known to me.  I may also provide an expert report and rebuttal and supplemental reports at a later date, in response to arguments which may be proposed

by Samsonite Group S.A., Samsonite LLC, Samsonite Company Stores, LLC, and Direct Marketing Ventures, LLC (collectively, "Defendants") and Defendants' experts.

6. I base the following opinion on my personal knowledge, experience, and expertise, as well as my review of the Asserted Patents, Defendants' Motion and the exhibits referred to therein, and the materials identified in the Motion. The opinions in this declaration regarding the interpretation of the references are all from the perspective of one of ordinary skill in the art at the time of the invention of the '071 Patent, which I have been informed by counsel is November 18, 2014. I have been informed by counsel that the priority date of the '137 Patent, the '138 Patent, and the '009 Patent (collectively, the "Continuation Patents") is also November 18, 2014. I understand that Defendants dispute this date and assert that the priority date of the Continuation Patents is April 19, 2019.

7. I am being compensated at my usual and customary rate of $400/hr for the preparation of this declaration. I have no financial interest in, or affiliation with, either Plaintiff or Defendants in this matter, and my compensation is completely independent of the outcome of this litigation.

## II. Background and Qualifications

8. I earned a Master of Industrial Design degree from Pratt Institute in New York, and have been an industrial designer, design strategist, and inventor for the past 29 years. I most recently worked with the design consultancy Product Development Technologies LLC ("PDT") since 1999, and served as PDT's Los Angeles Creative Director beginning in 2007.

9. Since PDT's acquisition in December 2017, I have continued my design practice through my consultancy Informed Innovation Inc. My work encompasses a broad range of activities related to product design and development, including strategic user research (to guide

clients toward optimal design solutions), aesthetic and technological innovation, and high-level program management. I also provide expert witness and litigation support services in matters related to patent and trade dress litigation.

10.     Prior to joining PDT, I worked as a staff designer at the New York-based design consultancies Henry Dreyfuss Associates and Cousins Design, then upon moving to Chicago as Senior Designer with Zenith Electronics Corp. I currently serve as Chair of the Industrial Designer's Society of America's (IDSA) Design Protection Committee, and as an Associate Professor at ArtCenter College of Design in Pasadena, California. My CV is attached to this declaration as Exhibit A.

11.     Throughout my nearly 30 year career in industrial design and product development I have been engaged to assist clients with a wide variety of design challenges, including numerous programs focused on consumer electronics for customers including Blackberry (Research in Motion), Motorola, Qualcomm, LG Electronics, Dell, Nokia and Kyocera, among others. My design practice has also involved the development of medical devices – home use, diagnostic and surgical – for clients including Olympus Medical, BARD Access Systems, Roche, Novartis and ConMed, personal care products for Kimberly Clark and Medela, office equipment for Swingline and Fellowes, and toys for Fisher Price and Learning Resources, in addition to dozens of other designs for well-known clients.

12.     Notably, and with respect to the matters most relevant to this case, I have been involved since at least 2002 as designer, creative director, and program manager for programs focused on soft goods and bags utilized to carry breast pumps, baby bottle and milk storage systems for Medela.  These bags feature specialized compartments to hold the various electronic and mechanical devices for which they are specifically designed, and incorporate cable management

solutions to neatly guide the various power cables and fluid transport tubes to their appropriate exit points. My experience in the design of specialized soft goods also includes backpack and waist pack systems for carrying communications and electronic equipment for troops in the field and civilian first responders, pet carriers for Aspen Pet, and soft-sided luggage lines for Paragon, Pathfinder, and Modobag.

13. My design practice has also focused on the development of consumer electronics including mobile phones, tablets, Bluetooth speakers and laptop PCs for customers including Blackberry (Research in Motion), Motorola, Qualcomm, LG Electronics, Dell and Nokia, in addition to dozens of other products for well-known clients over the course of my career which feature USB connectivity and charging ports, or which rely on the use of USB charging docks and other USB connective means for their operation.

14. For the above projects (and all design programs on which I have been engaged), I gained a comprehensive understanding of the intended users for each product I design, how they will use the product, and how my designs will be compared to other designs that consumers evaluate in their purchasing decisions. I possess a deep understanding of the research and strategy implemented in the development of these products, including to ensure that critical market opportunities and consumer needs and desires are addressed in the design process.

15. I have been named as inventor on over 40 issued and applied-for U.S. Patents. The complete list of these patents and published applications is attached as Exhibit B.

16. My design work has received awards and recognition from the Industrial Designers Society of America (which awards include, among others, the "IDSA 20/20 Award" recognizing twenty designers who contributed to the advancement of the design profession in 2020), the Chicago Athenaeum, the Consumer Electronics Association, the Toy Industry Association, ID

Magazine and the Wall Street Journal, and has been featured in books aimed at educating design students about the profession.

17.     In addition to my work in product design consulting, I have frequently offered my expertise as mentor and advisor to technology and hardware-focused startups via Los Angeles-based incubator and accelerator programs, and served as a member of the Board of Directors for the 3D scan-to-print medical device manufacturer MetaMason Inc. for five years.

18.     Given the foregoing range of professional and personal experience over the course of my career as an industrial designer, I believe I am well qualified to opine on the matters covered in this declaration and to testify as one skilled in the art of industrial design with respect to the inventions at issue in this case.

19.     During the previous 7 years, I have served as expert witness in over thirty cases related to patents and trade dress, and have testified either at trial or by deposition in 18 cases. The complete list of these matters is attached as Exhibit C.

20.     During the previous 10 years, I have authored approximately 26 articles and publications. Attached as Exhibit D is the list of articles and publications I have written.

21.     Prior to entering the profession of industrial design, I graduated Harvard Law School and practiced corporate and securities law. I have not practiced or been barred as an attorney for at least the last 27 years.

22.     I have been informed by counsel for Defendant about the relevant provisions of patent law to be applied for purposes of this declaration, which are summarized below. I have applied those principles to the facts of this case.

23.     I do not provide any guidance or opinion as to the law, which I understand is the purview of the court. Rather, the opinions expressed and reasoning applied are those of an

experienced industrial design consultant, viewing the relevant questions from the relevant perspectives (e.g., Person of ordinary skill in the art) and applying (as necessary) the law as it has been explained to me by counsel for Plaintiff.

### III. The Profession of Industrial Design

24. Merriam-Webster defines industrial design as "design concerned with the appearance of three-dimensional machine-made products." While this certainly captures the essence of the task which industrial designers focus on, I have often described the profession of Industrial Design as a combination of art and engineering, in which aesthetic considerations interact with the desires and needs of end-users and the marketplace, as well as the available possibilities of technology and mass production.

25. The ultimate goal of a professional industrial designer is to create useful and aesthetically pleasing products that will find broad acceptance with consumers, and commercial success for those who bring the products to market.

26. Professional industrial designers may provide their services as sole practitioners or in small consultancies, as part of larger firms that are hired to consult on behalf of clients who market and manufacture products, or as part of internal or "in-house" design groups which provide design services to larger organizations within which they operate. I have practiced in all of these modes throughout my career.

27. Industrial designers typically obtain either an undergraduate or graduate degree in industrial or product design, and some students may focus on specific areas of expertise within the profession, such as user interface (UI) design or transportation design.

28. A critical component of an industrial designer's skill set centers on his or her ability to understand the needs of consumers in the marketplace, often before a pencil is put to paper or a

software program is opened to begin what many understand as "design." The design process actually begins long before considerations of aesthetics, materials and similar concerns enter into the equation, in that the foundation for all good design is the ability to know just who you are designing for, and what that design needs to accomplish in order to satisfy their desires and exceed their expectations with respect to usability, functionality and appearance.

29.    To accomplish this foundational aspect of the design process, industrial designers are trained as keen observers of those for whom they are designing, which is often an ordinary consumer. Such observations may take place through formal methodologies of ethnographic or "user research," and / or less formal activities which provide insight into what an ordinary customer wants to purchase, what drives those purchasing decisions, and the experiences involved in different purchasing scenarios.

30.    Industrial designers also focus on developing options for the selection, layout and arrangement of a product's mechanical and electrical components, a fundamental step in the process of concept ideation, form development and ergonomic optimization. Prototyping of functional concepts, sometimes in conjunction with mechanical and/or electrical engineers, is a critical step in this process and is often driven by iterative "trial and error" to arrive at the best functional, aesthetic and production solutions which meet the objectives defined by the research described above.

IV.    **Materials Reviewed in Preparing this Declaration**

31.    In reaching the conclusions and opinions set forth in this declaration, I made inquiries and reviewed relevant materials in order to gain a thorough understanding of the issues to be considered. In this process, I relied upon the documents and items identified below, as well

as other materials cited and referenced in this declaration and my own relevant knowledge and experience.

32. More specifically, my efforts included review of the following:

- Review and evaluation of the Asserted Patents;

- Review of the pleadings in this case;

- Review and evaluation of the file histories of the Asserted Patents;

- Review of documents produced by Defendants;

- Review of documents produced by Plaintiff;

- I have also relied upon my education, academic and professional training, and my personal and professional experience, skills, expertise, consultation with Plaintiff's counsel regarding the relevant law.

## V. Legal Standards

33. Counsel for Swissdigital has advised me of the legal standards relevant to my analysis. I understand that there is a presumption that a patent is valid and that a defendant bears the burden of proving invalidity by clear and convincing evidence. It is my understanding that this burden never shifts to a patentee.

34. I understand that the filing date of the earliest application to which a patent claims priority may be considered the effective filing date of the patent, provided that the application meets the requirements of patent law.

35. I understand that a patent application with the same inventors as an earlier filed application has the effect of being filed on the date of the earlier application provided that the earlier filed application contains a written description of the invention in full, clear, concise, and exact terms as to enable a person skilled in the art to make and use the invention.

36.     I understand that a patent's specification must contain a written description of the invention that allows persons of ordinary skill in the art to recognize that the inventor invented the claimed subject matter as of the filing date of the application. The basic function of this written description is to disclose the invention, and an adequate written description need not recite the claimed invention precisely. An applicant complies with the written description requirement by describing the invention, with all its claimed limitations. It is also my understanding that a patent's claims are part of the specification and can therefore satisfy the written description requirement.

37.     I also understand that a patent's specification and the sufficiency of its written description are viewed from the perspective of a person skilled in the art as of the application filing date, and it is unnecessary to spell out every detail of the invention in the specification. Patent specifications are written for persons skilled in the art, and such persons come to a patent with the knowledge of what has come before. As such, a patent specification need not redescribe known prior art concepts or include information that is already known and available to the experienced public.

38.     It is my understanding that the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology. Particular inventions may require more or less disclosure, and the adequacy of the description of an invention depends on its content in relation to the particular invention.

39.     I also understand that drawings and diagrams in a disclosure alone may support or provide a written description of an invention, and any such drawings or diagrams are to be explained or interpreted from the vantage point of a person skilled in the art. But the written description does not require that every claimed element be illustrated, particularly in predictable

arts where the element not depicted is not necessary for the understanding of the subject matter sought to be patented.

40.     I understand that the Court has not rendered a claim construction opinion in connection with the terms of the claims of the '071, '137, '138, or '009 patents asserted in this case. In my opinions, I have applied the plain and ordinary meaning to all claim terms as they would be understood by a POSITA at the time of the invention in light of the claim language, specification, and prosecution history. Should the Court issue a claim construction ruling, I reserve the right to amend my analysis consistent with the Court's constructions.

## VI.     Technology and Patent Overview

41.     The title of the '071 Patent is "Bag or Luggage with USB Charging Connector." The '071 Patent issued on February 25, 2020 on an application filed on August 26, 2015. The '071 Patent claims a bag or luggage for convenient charging with specific requirements / features as enumerated in the claims. I have been informed that the '071 Patent's priority date is November 18, 2014 based on the foreign application CN2014 2 0692148 U ("the CN '148 application"). I understand that the Defendants in this case do not challenge this priority date as to the '071 Patent and assert that there are no material differences between the '071 Patent and the CN '148 application. Therefore, for purposes of this declaration I will refer to the disclosures contained in the '071 Patent. I reserve my right to amend this declaration to address the CN '148 application.

42.     The title of the '138 Patent is "Sheath for USB Charger." The '138 Patent claims priority to the application that resulted in the '071 Patent. The '138 Patent claims a sheath for convenient charging with specific requirements/features as enumerated in the claims. I understand that the '138 Patent is a continuation in part of the '071 Patent application.

43. The title of the '137 Patent is "Sheath for USB Charger." I understand that the '137 Patent claims priority to the application that resulted in the '071 patent. The '137 Patent claims a sheath for convenient charging with specific requirements/features as enumerated in the claims. I understand that the '137 Patent is a continuation of the '071 Patent application.

44. The title of the '009 Patent is "Sheath for convenient charging." I understand that the '009 Patent claims priority to the '071 patent application. The '009 Patent claims a sheath for convenient charging with specific requirements/features as enumerated in the claims. I understand that the '009 Patent is a continuation in part of the '071 Patent application.

45. I have been informed by counsel that a continuation application must not include any subject matter which would constitute new matter. Because the '137 Patent is a continuation of the application of the '071 Patent, it is my understating that the USPTO did not consider the '137 Patent to contain any new matter.

46. I understand that there is substantial overlap in the Figures disclosed in the '137 and '138 Patents, including Fig. 44 of the '137 Patent identified by Defendants. Because the '137 patent is a continuation of the application of the '071 Patent, I understand that the USPTO did not consider the Figures and descriptions it shares with the '138 Patent as new matter of the '138 Patent.

47. I also have been informed that during prosecution the application of the '137 Patent received a double patenting rejection in light of the application of the '138 Patent. I have been informed by counsel that a double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patently distinct from the reference claims.

48.     I understand that the double patenting rejection was directed to the same subject matter identified by the Defendants in this case as not meeting the written description requirement, including "a surrounding bottom portion."

**VII.    Opinion as to Level of Ordinary Skill in the Art**

49.     In view of my personal and professional education, skill, training, experience and expertise, in my opinion, a person of ordinary skill in the art relevant to the Asserted Patents as of the priority date of the Asserted Patents would have the equivalent of a four-year degree from an accredited institution (usually denoted as a B.S. degree) in industrial design or the equivalent, and approximately two years of professional experience. Additional graduate education could substitute for professional experience, while significant experience in the field might substitute for formal education.

50.     I was at least a person of ordinary skill in the art as of the November 18, 2014 priority date of the Asserted Patents.  My opinions regarding the disclosure provided by the '071 Patent are from the view of a person of ordinary skill in the art at the November 18, 2014 priority date.

**VIII.   Summary of Opinions**

51.     I have studied the specification, prosecution history, and record of the '071 Patent, the '137 Patent, the '138 Patent, and the '009 Patent and in my opinion, the asserted claims of the '137 Patent, the '138 Patent, and '009 Patent each contain a sufficient written description in the original application of the '071 Patent and are entitled to a priority date of November 18, 2014.

52.     I understand that the Defendants in this case are asserting that there is no written description support for the "surrounding bottom portion" claim term, which appears in every

independent claim of the continuation patents. Accordingly, for the purpose of this declaration, my opinion is focused on this claim term.

53. The subject matter of the '071 Patent invention is a bag or luggage product that is visually accessible and predictable such that the patent figures or combination of patent figures in the '071 Patent provide a POSITA with ample details regarding what the inventor has invented.

54. At the time the '071 Patent's priority application was filed, a POSITA would not need the claim language "surrounding bottom portion" spelled out in detail to be informed that the inventor of the '071 Patent as of November 18, 2014 would be fully informed of the scope of each of the asserted claims and would have possession of the asserted claims (including the claims of the '137 Patent, the '138 Patent, and '009 Patent) based on the disclosures contained in the application of the '071 Patent.

55. I have been informed by counsel that the defendants have proposed a claim construction for the term "surrounding bottom portion" of "a flat portion that extends outward from" and refers to the surrounding bottom portion as a "flange." Applying this construction and defendants' interpretation of the claim term, a POSITA would understand that the limitation is disclosed in Figure 6 of the '071 Patent, as annotated below:

FIGURE 6

56.     Figure 6 represents a "structural schematic diagram" of an embodiment of the invention.  The disclosed nameplate would convey to a POSITA an example of a surrounding bottom portion (i.e., a "flange").  Therefore, it is my opinion that Figure 6 would indicate that the inventor was in possession of the "surrounding bottom portion" limitation of the child patents at the time the '071 patent's priority application was filed.

57.     I understand that the inventor of the '071 Patent and the continuation patents was also the named inventor of another patent relating to bags or luggage, U.S. Patent No. 9,865,153 ("the '153 Patent"), which was filed on April 19, 2016 and claims priority to a foreign application filed on April 24, 2015.  The '153 Patent provides disclosures relating to a nameplate including that the nameplate may include a base and be made from flexible material.

58.     The '071 Patent expressly discloses a sheath and the specification provides several details regarding a female connector and its relationship to a sheath including that it provides waterproofing and that it is wrapped around a female connector.  USB extension cables with male and female connectors were well known in the art as of the priority date of the '071 Patent and the general size and shape of a female connector would have been understood to a POSITA at the time the '071 Patent's priority application was filed.

59.     At the time the '071 Patent's priority application was filed, a POSITA would have understood from the disclosures of the '071 Patent that the sheath would be three dimensional and have certain structural dispositions, including sides, a top, and a surrounding bottom portion.

60.     I understand the structural limitations of the sheath as disclosed in the '071 Patent. A POSITA would understand that a sheath wrapped on the outer surface of a female connector that provides a female connector in a flat position would possess a surrounding bottom portion.

61. A POSITA would understand the structure of the sheath including the "surrounding bottom portion" limitation to also be disclosed by the Figures of the '071 Patent that show a bag or luggage body as including an attached sheath, for example as depicted in Figures 1 (annotated below), 3 (annotated below), and 8.



62. The '071 Patent's disclosure of a sheath attached to a bag or luggage clearly discloses a means of attachment by a surrounding bottom portion.

63. A POSITA would understand from the disclosure of the '071 Patent that the sheath, which would be understood to cover the female connector, has a raised portion that extends above an outer surface of a bag or luggage body, for example as depicted in annotated Figure 3 below:



Raised portion

64.     Given this disposition, a POSITA would understand the '071 Patent to disclose that the sheath attached to a bag or luggage would require that the sheath possess a surrounding bottom portion.

65.     A POSITA would understand the continuation patents as focusing on the invention from the perspective of a sheath as opposed to the '071 Patent that focuses on the invention from the perspective of the larger bag or luggage. I understand that it is common practice for continuation patents to focus on elements of an invention disclosed in a parent patent and a POSITA would recognize this context and would not view additional embodiments or figures disclosed in a child patent as a new invention.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: May 9, 2025

Joel Delman

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's CM/ECF system.


*/s/ Kevin R. Mosier*
Kevin R. Mosier