**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| SWISSDIGITAL USA CO., LTD., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:24-cv-11636-JEK |
| SAMSONITE GROUP, S.A., SAMSONITE LLC, SAMSONITE COMPANY STORES, LLC, and DIRECT MARKETING VENTURES, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION AND
DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT**

**KOBICK, J.**

Plaintiff Swissdigital USA Co., Ltd. alleges that defendants Samsonite Group, S.A.,

Samsonite LLC, Samsonite Company Stores, LLC, and Direct Marketing Ventures, LLC

(collectively, "Samsonite") have directly and indirectly infringed four of its patents: one directed

at a bag or luggage with a USB charging connector, and three directed at sheaths that may be

incorporated into wearables or bags for convenient charging of personal devices. Pending before

the Court are the parties' claim construction briefs and Samsonite's partial motion for summary

judgment. For the reasons that follow, Samsonite's summary judgment motion will be granted in

part and denied in part.

**BACKGROUND**

**I.    The Patents**

Swissdigital is in the business of selling high-tech backpacks and other consumer goods.

ECF 1, ¶ 10. Samsonite is a worldwide travel luggage company. *Id.* ¶ 15. This case concerns four

of Swissdigital's patents: U.S. Patent Nos. 10,574,071 (the "'071 patent"); 10,931,137 (the "'137 patent"); 10,931,138 (the "'138 patent"); and 11,601,009 (the "'009 patent"). *See* ECF 58-3 to 58-6.

The '071 patent, which was filed on August 26, 2015 and issued on February 25, 2020, is titled "Bag or Luggage with USB Charging Connector." ECF 73, ¶¶ 3-4. It claims priority to a Chinese patent application, CN 2014 2 0692148 U ("Chinese 148 Application"), which has a priority date of November 18, 2014. *Id.* ¶ 5; ECF 58-3, at 2. The patent describes a "type of bag or luggage for convenient charging, which enables the user to charge a device or product needing to be charged conveniently at any time or any place during traveling, without necessarily opening the bag or luggage, nor taking out the power source for charging." ECF 58-3, at 14. The patent contains 10 figures and sets forth 17 claims, of which claims 1 and 10 are independent. *Id.* at 16-17.

Claim 1 teaches "[a] bag or luggage for convenient charging, comprising:

a bag or luggage body having a placing space for placing a power storage device inside the bag or luggage body and a power cable outlet on the outer surface of the bag or luggage body;
a USB extension cable having a male connector and a female connector having four sides and an operative end,
wherein the male connector of the USB extension cable is inside the bag or luggage body and is used to connect to the power storage device in the placing space;
wherein the female connector is retained outside and adjacent to the power cable outlet with one side of the four sides of the female connector in communication with the bag or luggage body, and the other three sides of the female connector are covered by a water proof sheath that protects the female connector and provides it in a flat position and wherein the sheath is above and covers the power cable outlet,
wherein the sheath does not cover the operative end of the female connector which is exposed and fixedly attached above the exterior of the bag such that the operative end of the female connector does not need to be moved and the bag or luggage body does not need to be opened to accept a charging interface of a product to be charged."

2

*Id.* at 16. Claim 10 describes slightly different limitations, though like claim 1, it recites a limitation "wherein the female connector is retained outside and adjacent to the power cable outlet with one side of the four sides of the female connector in communication with the bag or luggage body, and the other three sides of the female connector are covered by a water proof sheath that protects the female connector and provides it in a flat position." *Id.* at 16.

The '137 patent, which was filed on April 19, 2019 and issued on February 23, 2021, is titled "Sheath for USB Charger." ECF 73, ¶¶ 24-25. It claims a priority date of November 18, 2014 as a continuation of the '071 patent. *Id.* ¶¶ 26-27. The patent teaches a "sheath that may be incorporated into luggage, bags, gloves, activewear, jacket, socks, shoes, hats, glasses, goggles, belts or anything wearable or that can be carried for convenient charging, which enables the user to charge a device or product needing to be charged conveniently at any time or any place during traveling, without necessarily opening the bag, luggage, or clothing nor taking out the power source for charging." ECF 58-4, at 26. The specification contains 46 figures and recites 21 claims. ECF 73, ¶ 28; ECF 58-4, at 27-29.

Claim 1, the sole independent claim, teaches "[a] sheath for convenient charging, comprising:

> a sheath having a left side, top side and right side, a first tapered closed end, a second open end and a surrounding bottom portion surrounding the left side and the right side, the first tapered closed end and the second open end of the sheath,
> wherein at least a portion of the sheath extends above an outer surface of a body, wherein the body has an inner surface, an outer surface and a power cable outlet between the inner surface and the outer surface;
> wherein the sheath is at the power cable outlet and the sheath receives a female end of a USB cable having four sides, an operative end and a cord end,
> wherein the operative end of the female end of the USB cable is removably retained in the second open end of the sheath and the cord end of the female end of the USB cable is retained in the first tapered closed end of the sheath to provide the female end of the UBS [sic] cable in a flat position with the operative end of the female connector being uncovered and above the outer surface of the body,

3

> wherein the surrounding bottom portion is attached to the inner surface of the body,
>
> wherein the sheath has at least one ventilation opening on the top side."

ECF 58-4, at 28-29. The specification also notes that "the sheath may also have a surrounding bottom attachment portion (4508 and 4602) which allows the sheath to be easily attached to a body," and that "[t]he surrounding bottom attachment portion is a flat portion surrounding . . . at least three sides, the first tapered closed end and the second open end of the sheath." *Id.* at 28.

The '138 patent, which was filed on April 2, 2020 and issued on February 23, 2021, is also titled "Sheath for USB Charger." ECF 73, ¶¶ 36-37. It claims a priority date of November 18, 2014 as a continuation-in-part of the '137 patent.[1] *Id.* ¶¶ 38-39. Like the '137 patent, it provides for a "sheath that may be incorporated into luggage, bags, gloves, activewear, jacket, socks, shoes, hats, glasses, goggles, belts or anything wearable or that can be carried for convenient charging, which enables the user to charge a device or product needing to be charged conveniently at any time or any place during traveling, without necessarily opening the bag, luggage, or clothing nor taking out the power source for charging." ECF 58-5, at 30. The specification includes 61 figures and recites 24 patent claims, of which claims 1 and 23 are independent. *Id.* at 31-34; ECF 73, ¶ 40.

Claim 1 teaches "[a] sheath for convenient charging, comprising:

> a sheath having a left side, a right side and a top side, a first closed end, a second open end and a surrounding bottom portion surrounding at least a portion of one of the left side, the right side, the top side, the first closed end and the second open end of the sheath,

---

[1] A continuation patent application is "one filed during the pendency of another application which contains at least part of the disclosure of the other application and names at least one inventor in common with that application." *Transco Prods., Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 555 (Fed. Cir. 1994). In contrast, a continuation-in-part application "contain[s] a portion or all of the disclosure of an earlier application together with added matter not present in that earlier application." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 n.3 (Fed. Cir. 2008). Thus, "the quintessential difference between a continuation and a continuation-in-part is the addition of new matter . . . on which at least one claim [generally] relies for support." *Id.*

wherein at least a portion of the sheath extends above an outer surface of a body, wherein the body has an inner surface, an outer surface and an opening between the inner surface and the outer surface;

wherein the sheath is at the opening and the sheath receives a female end of a USB cable having four sides, an operative end, a cord end and a cord,

wherein the operative end of the female end of the USB cable is retained in the second open end of the sheath and the cord end of the female end of the USB cable is retained in the first closed end of the sheath to provide the female end of the UBS [sic] cable in a flat position with the operative end of the female connector being uncovered and above the outer surface of the body,

wherein the cord of the female end goes through the opening between the inner surface and the outer surface and the surrounding bottom portion is attached to a portion of the body."

ECF 58-5, at 33-34.

Claim 23 also teaches "[a] sheath for convenient charging, comprising:

a sheath having a raised portion that extends above an outer surface of a body, wherein the raised portion has a USB opening, and a surrounding bottom portion surrounding at least a portion of the raised portion,

wherein the body has an inner surface, an outer surface and a body opening between the inner surface and the outer surface;

wherein the sheath is at the body opening with the raised portion above the outer surface and at least a portion of the surrounding bottom portion is in communication with a portion of the body,

wherein the sheath has a female end of a USB cable in the USB opening, wherein the female end of the USB cable has four sides, an operative end and a cord end and the operative end of the female end of the USB cable is retained in the USB opening to provide the female end of the UBS [sic] cable in a flat position with the operative end of the female connector being uncovered and above the outer surface of the body."

Id. at 34. Like the '137 patent, the '138 patent notes that "the sheath may also have a surrounding bottom attachment portion (4508 and 4602) which allows the sheath to be easily attached to a body. The surrounding bottom attachment portion is a flat portion surrounding the at least three sides, the first tapered closed end and the second open end of the sheath." Id. at 32.

The '009 patent, which was filed on December 22, 2021 and issued on March 7, 2023, is titled "Sheath for Convenient Charging." ECF 73, ¶¶ 54-55. It claims a priority date of November 18, 2014 as a continuation-in-part of the '137 and '138 patents. Id. ¶¶ 56-59. Like the '137 and

'138 patents, the patent describes a "sheath that may be incorporated into luggage, bags, gloves, activewear, jacket, socks, shoes, hats, glasses, goggles, belts or anything wearable or that can be carried for convenient charging, which enables the user to charge a device or product needing to be charged conveniently at any time or any place during traveling, without necessarily opening the bag, luggage, or clothing nor taking out the power source for charging." ECF 58-6, at 25. The patent contains 72 figures and recites 30 patent claims, of which claims 1 and 29 are independent. ECF 73, ¶ 60; ECF 58-6, at 29-30.

> Claim 1 teaches "a sheath for convenient charging, comprising:
>
> a sheath having a left side, a right side and a top side, a first closed end, a second open end and a surrounding bottom portion surrounding at least a portion of one of the left side, the right side, the top side, the first closed end and the second open end of the sheath,
> wherein the sheath is separate from and attaches to a body having an inner surface, an outer surface and a first port between the inner surface and the outer surface,
> wherein at least a portion of the sheath extends above the outer surface of the body,
> wherein the sheath receives a female end of a cable connector having surrounding sides, an operative end, a cord end and a cord,
> wherein the operative end of the female end of the cable connector is retained in the second open end of the sheath and the cord end of the female end of the cable connector is retained in the first closed end of the sheath to provide the female end of the cable connector in a flat position with the operative end of the female connector being uncovered and above the outer surface of the body,
> wherein the cord of the female end goes through the first port between the inner surface and the outer surface and the surrounding bottom portion is attached to a portion of the body adjacent to the first port."

ECF 58-6, at 29.

> Claim 29 also teaches "[a] sheath for convenient charging, comprising:
>
> a sheath having a raised portion,
> wherein the sheath is a separate piece that attaches to a body and when the sheath is attached to the body the raised portion extends above an outer surface of the body,
> wherein the raised portion has an opening, and a surrounding bottom portion surrounding at least a portion of the raised portion,

6

wherein the body has an inner surface, an outer surface and a body opening between the inner surface and the outer surface;

wherein the sheath is at the body opening with the raised portion above the outer surface and at least a portion of the surrounding bottom portion is in communication with a portion of the body,

wherein the sheath has a female end of a cable connector in the opening, wherein the female end of the cable connector has surrounding-sides, an operative end and a cord end and the operative end of the female end of the cable connector is retained in the opening to provide the female end of the cable connector in a flat position with the operative end of the female connector being uncovered and above the outer surface of the body."

*Id.* at 30.

## II.     Procedural History

Swissdigital initiated this lawsuit against Samsonite on June 25, 2024, asserting four counts of direct and indirect patent infringement, both literally and under the doctrine of equivalents. ECF 1. Swissdigital claims that Samsonite has infringed at least claims 1 and 9 of the '071 patent; claims 1, 3-4, 6-7, and 18-21 of the '137 patent; claims 1-2, 4-8, 17-21, and 23 of the '138 patent; and claims 1-2, 4-8, 17-21, and 29 of the '009 patent. ECF 1, ¶¶ 39-40, 58-59, 78-79, 96-97. The parties have filed their claim construction briefs and responses to those briefs. ECF 36, 37, 49, 50. Samsonite has also moved for partial summary judgment regarding certain claims in the '137, '138, and '009 patents. ECF 56. After a combined hearing on claim construction and the motion for summary judgment, the Court took the matters under advisement. ECF 75.

## CLAIM CONSTRUCTION

The Court begins with the parties' dispute over the proper construction of the claims in the '071, '137, '138, and '009 patents. It will then address Samsonite's summary judgment motion.

## I.     Legal Standard

The purpose of claim construction is to resolve the parties' disputes regarding the scope of the patent claims, which "define the invention to which the patentee is entitled the right to

7

exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quotation marks omitted). At the claim construction stage, "a court need not attempt the impossible task of resolving all questions of meaning with" finality, nor should it "resolve questions that do not go to claim scope, but instead go to infringement or attorney argument." *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318-19 (Fed. Cir. 2016) (quotation marks omitted). It must, however, define the claim terms with sufficient specificity so that the jury may decide whether infringement occurred. *Id.* at 1320; *see Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996) ("construing the patent" is a question of law for the court to decide, whereas "determining whether infringement occurred" is a question of fact for the jury).

"[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).[2] The "actual words of the claim" are of prime importance, as the claims, and not the written description, "define the scope of the right to exclude." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). Thus, while claims must be read in view of the specification, a court "may not read a limitation into a claim from the written description." *Id.*; *see In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 348 (Fed. Cir. 2002) ("[I]nterpreting what is *meant* by a word *in* a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." (quotation marks omitted)).

In general, claim terms are "given their plain and ordinary meaning, which is the meaning that one of ordinary skill in the art would ascribe to a term when read in the context of the claims,

---

[2] Prosecution history "consists of the complete record of the proceedings before the [U.S. Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317.

specification, and prosecution history," measured "as of the effective filing date of the [patent application]." *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 130 F.4th 1372, 1378-79, 1383 (Fed. Cir. 2025). "Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). Courts may, however, depart from this general rule in two circumstances: "when a patentee (1) acts as his own lexicographer, or (2) disavows scope in the specification or during prosecution." *Maquet Cardiovascular LLC v. Abiomed Inc.*, 131 F.4th 1330, 1344 (Fed. Cir. 2025).

"A patentee 'may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.'" *Alnylam Pharms., Inc. v. Moderna, Inc.*, 138 F.4th 1326, 1333 (Fed. Cir. 2025) (quoting *Vitronics Corp.*, 90 F.3d at 1582). This intrinsic evidence must "'put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term.'" *Id.* (quoting *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001)). A patentee cannot "simply disclose a single embodiment or use a word in the same manner in all embodiments"; instead, it "must 'clearly express an intent' to redefine the term." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).

"The standard for disavowal of claim scope is similarly exacting." *Id.* at 1366. The Federal Circuit has cautioned that since "prosecution history represents an ongoing negotiation between the [U.S. Patent and Trademark Office] and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes" than the written description. *Phillips*, 415 F.3d at 1317. Where, however,

9

the inventor has made a clear and unmistakable disavowal during prosecution, either in the form of amendment or argument, the doctrine of prosecution disclaimer may clarify "how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013); *see Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution."). Patentees are held "to distinguishing statements made during prosecution even if they said more than needed to overcome a prior art rejection." *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1383 (Fed. Cir. 2021). Prosecution disclaimer should not apply "where 'the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations.'" *Maquet*, 131 F.4th at 1344 (quoting *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016)); *see also Omega Eng'g*, 334 F.3d at 1324 (collecting cases). "But where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g*, 334 F.3d at 1324.

Finally, even where lexicography and disavowal are not applicable, "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). In these cases, "claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit." *Id.* Courts must "strike the delicate balance between ensuring that they do not permit the jury to determine claim scope, on

10

the one hand, and ensuring that they do not encroach upon the constitutionally mandated function of the jury to find facts, on the other." *Nobelbiz, Inc. v. Glob. Connect, L.L.C.*, 876 F.3d 1326, 1327-28 (Fed. Cir. 2017) (O'Malley, J., dissenting from denial of petition for reh'g en banc).

## II.    Preamble: "A [sheath/bag or luggage] for convenient charging"

The parties first dispute whether the phrase "for convenient charging" in the preambles of the four asserted patents is limiting. The general rule is that a preamble does not limit the claims in a patent. *See Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017); *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). "However, a preamble may be limiting if: 'it recites essential structure or steps'; claims 'depen[d] on a particular disputed preamble phrase for antecedent basis'; the preamble 'is essential to understand limitations or terms in the claim body'; the preamble 'recit[es] additional structure or steps underscored as important by the specification'; or there was 'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'" *Georgetown Rail*, 867 F.3d at 1236 (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). Where, on the other hand, a preamble "'merely extol[s] benefits or features of the claimed invention,'" it "'does not limit the claim scope without clear reliance on those benefits or features as patentably significant.'" *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1355 (Fed. Cir. 2020) (quoting *Catalina Mktg.*, 289 F.3d at 808).

For claims directed to apparatuses, such as the patent claims at issue here, the Federal Circuit has "often relied on the proposition that '[p]reamble language that merely states the purpose or intended use of an invention is generally not treated as limiting the scope of the claim.'" *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1340-41 (Fed. Cir. 2021) (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006)); *see also Cochlear Bone*, 958 F.3d at

11

1355. Swissdigital argues, and the Court agrees, that a straightforward application of this rule compels the conclusion that the phrase "for convenient charging" in the four preambles is not limiting. The phrase merely highlights the "purpose or intended use" of the patents without adding anything more to the "structurally complete invention[s]" explicated in the claims. *Catalina Mktg.*, 289 F.3d at 808 (quotation marks omitted); *see Cochlear Bone*, 958 F.3d at 1355 (preamble phrase "'for rehabilitation of unilateral hearing loss'" was not limiting because it was "merely a statement of intended use of the claimed hearing aid" that did not provide an "inventive or patentably distinct aspect of the claimed invention" and "identifie[d] no structure for the apparatus claimed").

Samsonite disagrees, contending that the phrase "for convenient charging" is limiting because it is central to understanding the inventions claimed. Noting that the patent specifications "tout the purported convenience of the invention over the prior art," Samsonite argues that the patents "would have 'little meaning without the intended objective' of convenient charging" to explain the purpose of the claimed bag design and sheaths. ECF 37, at 5-6 (quoting *Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330, 1340-41 (Fed. Cir. 2010)). But the cases Samsonite cites are inapposite. Several are directed to method claims, not apparatus claims like the claims at issue here. The Federal Circuit has explained that "statements of intended purpose" are usually considered limiting for method claims, but not apparatus claims, because method claims "typically rely entirely on what the method 'does,'" whereas claims directed at apparatuses "'cover what a device *is*, not what a device *does*.'" *Eli Lilly & Co.*, 8 F.4th at 1340-42 (quoting *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990)); *see Catalina Mktg.*, 289 F.3d at 809 ("[P]reambles describing the use of an invention generally do not limit the claims because the patentability of apparatus or composition claims depends on the claimed structure, not on the use or purpose of that structure.").

Other cases that Samsonite cites involved apparatus claims with preamble phrases that, unlike those here, "disclose[d] a fundamental characteristic of the claimed invention[s]." *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (quotation marks omitted). In *Poly-America*, for instance, in considering a patent directed to a landfill liner, the Federal Circuit explained that the preamble phrase "'blown-film'" was substantively limiting because it "represented an important characteristic of the claimed invention" that had been referenced throughout the specification and claims. *Id.* The preamble phrase "did not state a purpose or an intended use of the invention"; instead, "blown-film" referred to a process by which the liner was created. *Id.* at 1306, 1310. Here, by contrast, the phrase "for convenient charging" merely describes the intended purpose of the claimed apparatuses, not a process by which the apparatuses are made. Similarly, in *Proveris Scientific Corporation v. Innovasystems, Inc.*, a case concerning a patent for a "mechanism for evaluating aerosol spray plumes," the Federal Circuit concluded that the preamble language was limiting. 739 F.3d 1367, 1369, 1372-73 (Fed. Cir. 2014). The specification in that case identified the invention "as producing a 'sequential set of images' and focuse[d] on the ability of the invention to capture 'the time evolution of the spray,'" and the preamble contained "the only reference in any independent claim to the inventive concept of capturing a sequence of images in order to characterize the time evolution of the spray plume." *Id.* at 1373. In other words, the preamble was critical to give meaning to the claim in accordance with its specification. The preamble phrases here, on the other hand, are not necessary to articulate or define the invention claimed. They merely state the benefit of the asserted patents: convenient charging. Accordingly, the preambles are not limiting.

13

### III.    "the outer surface of the bag or luggage body"

The next dispute—over the term "the outer surface of the bag or luggage body" in claim 1 of the '071 patent—was largely resolved at the hearing. In the parties' briefs, Swissdigital argued that the Court should apply the plain meaning of the term, whereas Samsonite argued that Swissdigital's prosecution disavowal required the Court to construe the term to mean "the outermost surface of the bag or luggage body such that it can be accessed without opening the bag or luggage." At the hearing, however, Swissdigital clarified that the meaning of "the outer surface" was in fact limited to the exterior, outermost surface of the bag or luggage, though it argued that this meaning was apparent from the plain meaning of the definite article "the," such that no construction was necessary. ECF 78, at 34:3-35:15, 37:21-25. And Samsonite conceded that if the Court adopted the "the outermost surface" construction, it would not need to also add "such that it can be accessed without opening the bag or luggage," because that language would be redundant. *Id.* at 23:11-24:3.

Notwithstanding their apparent agreement that "the outer surface" means "the outermost surface," the parties continued to dispute at the hearing whether that construction derives from the term's plain meaning or in part from disclaimers made during the prosecution of the '071 patent. The Court agrees with Samsonite that the applicant's disclaimers limited the scope of "the outer surface" to "the outermost surface," and that construction of the term is necessary to clarify its meaning, particularly in light of the '137, '138, and '009 patents' definition of "outer surface." The applicant's response to the patent examiner's rejections of the applicant's claims as anticipated by U.S. Patent Publication 2012/0262117 to Ferber ("Ferber") demonstrates that the applicant disclaimed any scope of "the outer surface" referring to interior surfaces, including those within pockets or flaps on a bag. Ferber, like the '071 patent, is directed at a "bag or luggage body for

14

convenient charging." ECF 37-1, at 5. During prosecution, the applicant distinguished the inventions by clarifying that Ferber's "power cable outlet and the portion being relied on for the 'female connector' are on the interior of the bag" insofar as "[t]hey are protected by the interior pocket and flap of the bag." ECF 50-2, at 37. "Still further," the applicant continued, Ferber "fails to teach the limitation of 'a power cable outlet <u>on the outer surface of the bag or luggage body</u>.'" *Id.* (emphasis in original). The applicant also noted that where the '071 patent claims "'a power cable outlet <u>on the outer surface of the bag or luggage body</u>,'" the examiner relied on an analogous aperture "on the interior of the bag" in "an interior pocket or front pocket" that thus was not on the "outer surface." *Id.* at 36 (emphasis in original). Taken together, these statements unequivocally disclaim the scope of "the outer surface of the bag or luggage body" to include surfaces that are protected by an interior pocket or front pocket, such that construing the phrase "the outer surface" to mean "the outermost surface" is appropriate. *See Omega Eng'g*, 334 F.3d at 1324.

At the hearing, Swissdigital acknowledged that the definite article "the" in "the outer surface" is an indication that the claim language was limited to the exterior of the bag or luggage body. It argued, however, that this meaning is apparent from the plain language of the term, such that construction is not necessary. In light of the parties' agreement that "the outer surface" means "the outermost surface," the dispute regarding the meaning of "outer surface" in the other patents, and the Court's obligation to "ensure that the jury fully understands [its] claim construction rulings and what the patentee covered by the claims," the Court will adopt "the outermost surface" construction proposed by Samsonite. *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (quotation marks omitted). It will not, however, include the rest of Samsonite's proposed construction—"such that it can be accessed without opening the bag or luggage"—in light of Samsonite's concession that this language would be redundant.

15

IV.    **"an outer surface of [the/a] body"**

The parties next dispute the construction of the term "an outer surface of [the/a] body" in the '137, '138, and '009 patents. Samsonite contends that the proper construction of this term is controlled by the applicant's disclaimer regarding "the outer surface of the bag or luggage body" in the prosecution history of the parent '071 patent. Swissdigital disagrees, arguing that the term in the '137, '138, and '009 patents should be given its plain and ordinary meaning because the child patents, which claim "*an* outer surface of [the/a] body," recite a different claim limitation than the '071 patent, which claims "*the* outer surface of the bag or luggage body."

Where a court construes "claim[s] in patents that derive from the same parent application and share common terms, '[it] must interpret the claims consistently across all asserted patents.'" *Cap. Mach. Co. v. Miller Veneers, Inc.*, 524 F. App'x 644, 647 (Fed. Cir. 2013) (quoting *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005)); *see Omega Eng'g*, 334 F.3d at 1335 (in considering whether claim limitation in parent means-plus-function patent applied to the construction of a child method patent, explaining that "prosecution disclaimer attaches to progeny continuation in part applications where the same claim limitation is at issue"). Of course, "a patent applicant is not precluded from filing a continuation application with broader claims" than those asserted in the parent patent. *Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1317 (Fed. Cir. 2007); *see X2Y Attenuators, LLC v. Int'l Trade Comm'n*, 757 F.3d 1358, 1366 (Fed. Cir. 2014) (Reyna, J., concurring) ("The disclosures of related patents may inform the construction of claim terms common across patents, but it is erroneous to assume that the scope of the invention is the same such that disclaimers of scope necessarily apply across patents, particularly when continuation-in-part applications are involved."). But "an applicant cannot recapture claim scope that was surrendered or disclaimed" during the prosecution of the parent patent unless "the

16

prosecution history [is] sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited." *Hakim*, 479 F.3d at 1317-18.

Samsonite argues that *Hakim* is controlling and that the Court should find that the disclaimer made during the prosecution of the '071 patent applies to the '137, '138, and '009 patents because the applicant did not rescind the disclaimer clearly when prosecuting those later patents. In *Hakim*, which concerned spill-proof cups, the Federal Circuit concluded that the term "opening" in the continuation patent at issue was limited to a "slit" based on the prosecution history of the parent application, even though the applicant had included an attorney letter explaining his intention to broaden the claims and an amendment changing the term "slit" to "opening." *Id.* at 1315-16. The Federal Circuit concluded that the applicant could not recapture the disclaimed scope without a rescindment that was "sufficiently clear" that the earlier disclaimer and the prior art to which it pertained may need to be reexamined. *Id.* at 1317-18.

Here, all four patents use the claim language "outer surface"—which Samsonite deems the "substantive term at issue." ECF 50, at 12 (emphasis omitted). But unlike in *Hakim*, the specifications of the '137, '138, and '009 patents contain language explicitly refuting the construction Samsonite argues should apply based on disclaimer in the '071 patent. The specifications state: "There may be a second outer surface (3300) that covers the outer surface of the body (3302). Similarly, the outer surface of the body may be the inside of a pocket. . . . The outer surface onto which the sheath is mounted may have an additional cover or be on the inside of a pocket without departing from the present invention." ECF 58-4, at 28 ('137 patent); ECF 58-5, at 32 ('138 patent); ECF 58-6, at 27 ('009 patent). Further, claim 4 of the '137 patent, claim 5 of the '138 patent, and claim 5 of the '009 patent recite "[t]he sheath as in claim 1, further comprising a second outer surface that covers the outer surface of the body." ECF 58-4, at 29; ECF

17

58-5, at 34; ECF 58-6, at 29. And claim 18 of all three patents recites "[t]he sheath as in claim 1, wherein the outer surface of the body is the inside of a pocket." ECF 58-4, at 29; ECF 58-5, at 34; ECF 58-6, at 29. Construing "outer surface" as Samsonite urges—to mean a single "outermost surface"—would nullify these clear instances of lexicography defining the scope of "an outer surface" and multiple claims of the child patents.

Swissdigital urges the Court to find that the claim language used in the parent and child patents is different enough that the disclaimer applicable to the '071 patent does not apply to the '137, '138, and '009 patents. Disclaimer in the prosecution history of one patent will attach only to related patents that contain "the same or closely related claim limitation language." *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 943 (Fed. Cir. 2013); *see also Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) (holding that prosecution disavowal that was applied to construction of "feed tube" in parent patent attached to child patent's "feed probe" limitation and noting that the applicant had linked the terms in the prosecution history, putting competitors on notice of that connection); *cf. Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305-06 (Fed. Cir. 2001) (prosecution disavowal in parent patent was not applied to child patents where "there are no common claim terms in dispute"); *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1382-83 (Fed. Cir. 2003) (deeming the claim term "'each field'" in the parent patent distinct from the term "'each of a plurality of fields'" in the related patent because "'plurality' suggests the use of 'at least two'" and therefore declining to apply prosecution history of parent patent). Here, while the '071 patent uses the definite article "the" to modify "outer surface," the '137, '138, and '009 patents use the indefinite article "an" to modify "outer surface." In patent parlance, the article "an" "carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Baldwin Graphic Sys., Inc. v. Siebert*, 512 F.3d

18

1338, 1342 (Fed. Cir. 2008). This distinction, Swissdigital argues, indicates that while the term "the outer surface" in the '071 patent refers to a single surface—that is, the exterior of the bag or luggage body—the term "an outer surface" in the '137, '138, and '009 patents is broader and can encompass multiple outer surfaces, as confirmed by the clarifying language in the specifications.

The Court agrees. The Federal Circuit has warned that prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1348 (Fed. Cir. 2020) (quotation marks omitted). Here, the disclaimer made during the prosecution of the '071 patent does not overcome the linguistic differences in the claim terms across the four patents and the clear lexicography in the specifications of the child patents. *See id.* at 1346 (rejecting construction that would render dependent claims invalid because the "plain language of these dependent claims weighs heavily in favor of adopting [the petitioner's] broader claim construction"). The rule set forth in *Hakim* is centrally concerned with the importance of providing clear public notice, such that a patentee cannot "state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement." 479 F.3d at 1318 (quotation marks omitted). Had the applicant simply included the same "outer surface" language without the clear definition of "outer surface" in the specification, rescindment may indeed have been required to put the examiner and other inventors on notice of the change between the patents' use of the similar claim language. But here, the applicant included lexicography that made clear that the term "an outer surface" in the '137, '138, and '009 patents had a different meaning than the term "the outer surface" in the '071 patent. Accordingly, the plain and ordinary meaning of the term "an outer surface" governs, informed by the definition set forth in the specifications of the child patents.

19

## V.     "fixedly attached"

The parties next dispute the construction of the term "fixedly attached" in claim 1 of the '071 patent. Swissdigital argues that it should be given its plain and ordinary meaning and that no construction is necessary. Samsonite contends that, based on the definition of the term set forth in the prosecution history and the prosecution disclaimer, the term should be construed to mean "fastened to or adjoined such that it does not move and cannot be removed." In Samsonite's view, this construction is necessary because the parties' dispute—over whether "fixedly attached" means that the female connector does not move, and cannot be removed from, the sheath—concerns the scope of the claims.

The claim recites a sheath that "does not cover the operative end of the female connector which is exposed and fixedly attached above the exterior of the bag such that the operative end of the female connector does not need to be moved and the bag or luggage body does not need to be opened to accept a charging interface of a product to be charged." ECF 58-3, at 16. Samsonite contends that, in prosecuting the patent, the applicant acted as its own lexicographer with respect to the term "fixedly attached." Specifically, Samsonite insists, the applicant's amendment and response to the patent examiner states that "[t]he entire purpose of the present invention is to provide the female USB connector that does not move (claimed as 'fixedly attached')." ECF 37-2, at 11. The Court agrees that this statement demonstrates the applicant's clear intent to define "fixedly attached" to mean "does not move." This definition of "fixedly attached" does not, however, depart from the ordinary meaning of the term and thus does not necessitate construction.

Less clear is whether Samsonite's proposed addition of "cannot be removed" is supported by any disclaimer in the prosecution history. According to Samsonite, several examples in the prosecution history bear on this determination. First, in highlighting a "very important distinction"

20

between Ferber and the '071 application, the applicant explained that "[t]he connectors of Ferber are contained within the compartment, unless they are to be used," at which point "they are removed from the compartment for use." ECF 37-2, at 11. By contrast, the applicant explained, "[t]he entire purpose of the present invention is to provide the female USB connector that does not move (claimed as 'fixedly attached') and is in the flat position (this make[s] it more secure and easy to plug the charging interface of the product to be charged into the female connector of the USB extension cable)." *Id.* This statement does not suggest that the female connector *cannot* be removed from the exterior of the bag—only that when charging a personal device, the user need not take a connector out of a compartment. *See id.* at 7 (explaining that in the present invention, the female connector is "fixedly attached above the exterior of the bag such that the operative end of the female connector does not need to be moved and the bag or luggage body does not need to be opened to accept a charging interface of a product to be charged," whereas in Ferber, the connector is "retained when not being used and is pulled out of the pocket . . . to be used"); *id.* at 12 ("Ferber also teaches that the connector must be removed from the pocket to charge the device. This does not teach or suggest the claims."). Similarly, the examiner interview summary that Samsonite points to—which notes that the applicant "proposed amendments to overcome Ferber" and explained that the "sheath and USB connector are rigidly attached to the exterior surface of the bag"—does not imply that the USB connector cannot be removed from the exterior surface of the bag. ECF 50-3, at 3. Instead, it merely states that the USB connector is placed there "rigidly." *Id.*[3]

---

[3] Nor are Samsonite's arguments about other instances of the term "fixture" and "attached" in the '071 patent availing. The abstract describes a "fixture for fixing a product to be charged," but it does not shed light on whether the female connector can be removed from the outer surface of the bag. *See* ECF 58-3, at 1. And Figure 2, which portrays a dust cap "attached" to the operative

Samsonite also observes that while the '071 patent recites the "operative end of the female connector" is "fixedly attached above the exterior of the bag," ECF 58-3, at 16, the '137, '138, and '009 patents recite that the operative end is "retained" or "removably retained in the second open end of the sheath," ECF 58-4, at 28; ECF 58-5, at 34; ECF 58-6, at 29. Samsonite argues that this difference is significant, because "attachment connotes fastening or joinder, while retainment does not." ECF 37, at 19. Pointing in particular to the '137 patent, Samsonite argues that by claiming "'removably retain[ing]' the connector," the patent "effectively *requir[es]* the ability to remove the connector." *Id.* (emphasis in the original). In Samsonite's view, the shift to the "retained" or "removably retained" language in the '137, '138, and '009 patents implies that "fixedly attached" in the '071 patent means not removable. But Samsonite points to no clear statement that the '071 patent involved a female connector that could not be removed. And the addition of "removably retained" was made to distinguish the '137 patent from U.S. Patent No. 10,547,036 ("Ashley"), not to distinguish the '137 patent from the '071 patent. ECF 37-12, at 7.

The Court concludes that construction of the claim term "fixedly attached" is not necessary and that the plain and ordinary meaning should apply. Samsonite's contention that the term should be construed to mean that the female connector "cannot be removed" is not warranted by the claim language, specification, or prosecution history, and a person of skill in the art would not import that additional limitation to the plain meaning of the claim term. The applicant's statement that "[t]he entire purpose of the present invention is to provide the female USB connector that does not

---

end of the female connector, does not suggest that the female connector and dust cap cannot be detached. *Id.* at 5, 15.

move (claimed as 'fixedly attached')" does not define "fixedly attached" in a way that departs from the ordinary meaning of that term such that further construction is required. ECF 37-2, at 11.[4]

## VI.    "adjacent to the [power cable outlet/first port]"

The parties agree that this term should be given its plain and ordinary meaning. ECF 50, at 17; 50-6, at 2. The Court accordingly adopts that construction.

## VII.    "surrounding bottom portion"

Finally, the parties contest the construction of the term "surrounding bottom portion" in claims 1, 20, and 21 of the '137 patent; claims 1, 2, 20, 21, and 23 of the '138 patent; and claims 1, 2, 20, 21, and 29 of the '009 patent. Each of these three patents claims a "sheath for convenient charging," and the "surrounding bottom portion" term appears in the claims' wherein clauses. Swissdigital argues that no construction of the term is necessary and that the Court should simply adopt a plain and ordinary reading. Samsonite contends that the term should be construed to mean "a flat portion that extends outward from the bottom of."

Samsonite's argument proceeds as follows. According to the dictionary, there are several ordinary meanings of "surrounding"—for example, to "extend on all sides of simultaneously," to "encircle," or to "enclose or confine on all sides"—such that a person of skill in the art would understand that term "to have multiple meanings applicable to the claimed 'sheath.'" ECF 37, at 17 (citing The Am. Heritage Dictionary of the English Language, at 320 (5th ed. 2019) and The Merriam-Webster Dictionary, at 324 (2019)). This lack of clarity, Samsonite says, gives rise to a

---

[4] Having resolved the parties' dispute based on the intrinsic evidence alone, the Court does not consult the reasoning in *Swissdigital USA Co. v. Wenger S.A.*, No. 6:21-cv-453-ADA-DTG, 2022 WL 3567348 (W.D. Tex. Aug. 18, 2022), another case construing the same term. The construction in *Wenger* is "non-binding extrinsic evidence," *MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 153 (Fed. Cir. 2011), and should not be considered if the intrinsic evidence clearly establishes the meaning of the claim term, *Vitronics Corp.*, 90 F.3d at 1583.

dispute over the scope of the patent, requiring the Court to consult the specification, embodiments of the patents, and prosecution history. In Samsonite's view, each of these categories of intrinsic evidence supports its proposed construction. Swissdigital disputes that the intrinsic evidence supports Samsonite's proposed construction, which it views as an attempt to improperly limit the scope of the claims. As Swissdigital sees it, a "surrounding bottom portion" could include "a flat portion that extends outward from the bottom of" the sheath, but it could also include other things, like the bottom part of the sheath itself. In Swissdigital's view, the "surrounding bottom portion" does not necessarily extend outward from the sheath, nor does it need to be flat.

The Court begins with the parties' dispute over whether the "surrounding bottom portion" extends outwards from the sheath. None of the patents define the term "surrounding bottom portion," but the specifications of the '138 and '009 patents describe the term in detail. These specifications describe various arrangements between the "surrounding bottom portion" and the "body," where the "body" refers to a bag, item of clothing, or other wearable to which the sheath holding the charging cable can be attached. ECF 58-5, at 30, 32-33; 58-6, at 25, 27-28. Depending on the embodiment, the "surrounding bottom portion" may be attached to the inner surface of the body, or it may sit on top of the body, or it may be attached to a piece of material. ECF 58-5, at 32-33; 58-6, at 27-28. But in each embodiment, the "surrounding bottom portion"—labeled as such in figures 44, 47, 48, 49, 51, and 53 of the '138 and '009 patents—unmistakably extends outwards from the sheath. ECF 58-5, at 23 (labeled 4402), 26 (labeled 4702, 4704, 4802, 4804, 4906), 27 (labeled 5100), 28 (labeled 5300), 32-33; 58-6, at 16, 19-21, 27-28. Indeed, Swissdigital has pointed to no embodiment, and no language in the claims themselves or the specification, suggesting that the "surrounding bottom portion" does not extend outward. And construing the

24

term to extend outward from the bottom is in harmony with any plain meaning of the term "surrounding."

In some of the embodiments, like figures 44 and 51, the "surrounding bottom portion" encircles all sides of the sheath. ECF 58-5, at 23, 27; ECF 58-6, at 16, 20. In other embodiments, the "surrounding bottom portion" does not extend outward from all sides of the sheath, or even from three sides of the sheath. In figures 47 and 48, for example, the "surrounding bottom portion," as labeled, extends outward on two sides of the sheath. ECF 58-5, at 26; 58-6, at 19. That the "surrounding bottom portion" may, but need not, extend outward from four or three sides of the sheath is consistent with a related but different term—a "surrounding bottom *attachment* portion"—that is a subset of the broader phrase "surrounding bottom portion." The specifications note that "the sheath *may* also have a surrounding bottom attachment portion," suggesting that a surrounding bottom attachment portion is a possible embodiment of the patent. ECF 58-4, at 28; ECF 58-5, at 32; ECF 58-6, at 27. And in each of the three continuation patents, the applicant acted as a lexicographer and defined a "surrounding bottom attachment portion" as "a flat portion surrounding . . . at least three sides, the first tapered closed end and the second open end of the sheath." ECF 58-4, at 28; 58-5, at 32; 58-6, at 27. That definition is consistent with figures 45 and 46 of the three patents, which have the "surrounding bottom attachment portion" labeled. ECF 58-4, at 24 (labeled 4508), 25 (labeled 4602), 28; 58-5, at 24-25, 32; 58-6, at 17-18, 27. Thus, a "surrounding bottom attachment portion" is a more limited subset of a "surrounding bottom portion" that (1) extends outwards on at least three sides of the sheath, and (2) is flat.

Construing the broader term "surrounding bottom portion" to extend outwards from the bottom is likewise consistent with the prosecution history. For example, in a response characterizing the '009 patent, the applicant attached one of the embodiments of the patent—figure

25

44—with an arrow pointing to the part of the image that extends outwards at the bottom, explaining "this is the surrounding bottom portion." ECF 37-13, at 10. And the interview summary drafted by the primary examiner states that the "surrounding bottom portion was not part of the body/bag." ECF 37-14, at 3. Taken together, the claims, specifications, and prosecution history of the '137, '138, and '009 patents clearly indicate, and a person of skill in the art would understand, that the "surrounding bottom portion" refers to a portion that "extends outward from the bottom" of the sides that it surrounds. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) (it is proper to read limitations into the claims when there exists a "clear indication in the intrinsic record that the patentee intended the claims to be so limited"). The surrounding bottom portion cannot merely be the bottom of the sheath, where that bottom side of the sheath does not extend outward.

The question whether the applicant intended the "surrounding bottom portion" to be flat is not so clear. On this point, the Court is guided by the "presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006); *see* 35 U.S.C. § 112(d) (dependent claims "shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed"). Claim 21 of each of the three patents, which is a dependent claim, recites "[t]he sheath as in claim 1, wherein the surrounding bottom portion is a flat portion." ECF 58-4, at 29; 58-5, at 34, 58-6, at 29. The only limitation claim 21 adds to claim 1 is that the "surrounding bottom portion" is a flat portion. In accordance with the presumption that an independent claim should not be construed to require a limitation added by a dependent claim, the flatness limitation referenced in claim 21 cannot be imported into claim 1 or the other independent claims. Indeed, reading in the requirement that the "surrounding bottom portion" is

26

flat, as Samsonite proposes, would "not only make that additional limitation superfluous, it might render the dependent claim invalid." *Curtiss-Wright*, 438 F.3d at 1380. The Court therefore will not adopt the "flat" limitation contained in Samsonite's proposed construction. Instead, it construes "surrounding bottom portion" to mean "a portion that extends outward from the bottom of."

## SUMMARY JUDGMENT

Samsonite moves for partial summary judgment on Swissdigital's claims of infringement regarding claims 1, 3, 6-7, and 19-21 of the '137 patent; claims 1-2, 4, 6-8, 17, 19-21, and 23 of the '138 patent; and claims 1-2, 4, 6-8, 17, 19-21, and 29 of the '009 patent. ECF 56, at 4. Samsonite's theory is that the correct priority date for the '137, '138, and '009 patents is April 19, 2019, the date the '137 patent was filed, rather than November 18, 2014, the priority date for the '071 patent. That is so, Samsonite argues, because a later-filed patent can claim priority to an earlier-filed patent only when the later patent involves the same claimed invention as the earlier patent. And Samsonite sees the addition of the "surrounding bottom portion" limitation in the '137, '138, and '009 patents as effectively claiming a new invention, because a person of skill in the art would not have understood that a surrounding bottom portion was part of the invention claimed in the '071 patent. Samsonite then points to two products—Swissdigital's TSG4H157 Bag and the 6067 Bag sold by Group III International, Inc.—that it says were available for sale over a year before April 19, 2019. According to Samsonite, because Group III and Swissdigital sold products practicing the claims in the '137, '138, and '009 patents before April 19, 2018, the patents are invalid under the on-sale bar of 35 U.S.C. § 102.

Swissdigital disputes both arguments. It contends that a person of ordinary skill in the art would have understood the '071 patent to disclose the "surrounding bottom portion" limitation of the invention, even though the patent did not use those exact words. And even if the '071 patent

27

did not claim an invention with the "surrounding bottom portion," such that the correct priority date for the '137, '138, and '009 patents is April 19, 2019, Swissdigital argues that disputes of material fact remain over whether the bags it and Group III sold were available for sale before April 19, 2018 and practiced the claims in the '137, '138, and '009 patents, such that the Court cannot determine invalidity on summary judgment.

Summary judgment is appropriate when, based upon the record and drawing all justifiable inferences in favor of the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party meets its burden, the non-moving party may not simply "rest upon mere allegation or denials," but instead "must present affirmative evidence" to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). Further, because patents are presumed valid, *see* 35 U.S.C. § 282(a), "a moving party seeking to invalidate a patent at summary judgment must submit . . . clear and convincing evidence of invalidity so that no reasonable jury could find otherwise," *Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

## I.    Priority Date

Entitlement to priority under 35 U.S.C. § 120 "is a legal determination based on underlying fact findings." *Natural Alternatives Int'l, Inc. v. Iancu*, 904 F.3d 1375, 1379 (Fed. Cir. 2018). Pursuant to Section 120, "a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008) (quotation marks omitted). Section 112, in turn, requires a

specification to "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112(a). This requirement of an "[a]dequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991) (quotation marks omitted).

To determine whether the specification of an earlier-filed patent provides support for the claims of a later-filed patent, a court must ask "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession *of the claimed subject matter* as of the filing date." *Nalpropion Pharms., Inc. v. Actavis Lab'ys FL, Inc.*, 934 F.3d 1344, 1350 (Fed. Cir. 2019) (quotation marks omitted); *see PowerOasis*, 522 F.3d at 1306 (the relevant inquiry is not "whether one skilled in the art *might* be able to construct the patentee's device from the teachings of the disclosure" but "whether the application necessarily discloses that particular device" (quotation marks omitted)). This determination "requires an objective inquiry into the four corners of the specification from the perspective of" a person having ordinary skill in the art. *D Three Enters., LLC v. SunModo Corp.*, 890 F.3d 1042, 1047 (Fed. Cir. 2018) (quotation marks omitted). The patent therefore need not "spell out every detail of the invention," as a person of ordinary skill in the art "comes to the patent with the knowledge of what has come before." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005). What is essential is that "the missing descriptive matter must necessarily be present in the [original] application's specification such that one skilled in the art would recognize such a disclosure." *PowerOasis*, 522 F.3d at 1306 (quotation marks omitted). "Compliance with the written

29

description requirement [of 35 U.S.C. § 112(a)] is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *D Three Enters.*, 890 F.3d at 1047 (quotation marks omitted).

Samsonite contends that the '137, '138, and '009 patents are not entitled to the '071 patent's November 18, 2014 priority date because the '071 patent does not contain adequate written description support for the "surrounding bottom portion" limitation set forth in the '137, '138, and '009 patents. The Court agrees. As Samsonite points out, the '071 patent does not mention a "surrounding bottom portion" (or, for that matter, a "surrounding bottom attachment portion") in the claims or the specification. *See* ECF 58-3. Nor do the words "surround," "surrounding," or "portion" appear separately in the '071 patent's claims or specification. *Id.* And the only uses of the word "attach" or its variants are in the aforementioned "fixedly attached" term or in reference to a dust cap that may be attached to the operative end or side of the female connector. *Id.* at 14-17. Even though claim 1 of the '071 patent recites a female connector with three sides "covered by a water proof sheath," while "one side of the four sides of the female connector [is] in communication with the bag or luggage body," the claim does not specify whether or how the sheath or female connector is attached to the claimed bag or luggage. *Id.* at 16. In the '137, '138, and '009 patents, by contrast, the sheath has a left side, right side, top side, a first closed end, a second open end, and a surrounding bottom portion, and it is the surrounding bottom portion that is attached to the body. *See* ECF 58-4, at 28-29; ECF 58-5, at 33-34; ECF 58-6, at 29. Further, unlike the embodiments in the '137, '138, and '009 patents, none of the embodiments depicted the '071 patent portray anything that extends outward from the bottom of the sheath that could be used for attachment. There is simply nothing in the '071 patent that would reasonably convey to a person

of skill in the art that the inventor was in possession of an invention containing a surrounding bottom portion.

Swissdigital does not dispute that if the '071 patent fails to convey a "surrounding bottom portion" as part of the invention, the '137, '138, and '009 patents cannot rely upon the '071 patent's priority date. But Swissdigital maintains, for three reasons, that the '071 patent does reasonably convey that the invention possessed a "surrounding bottom portion." First, Swissdigital argues that a "surrounding bottom portion" can be the bottom of the sheath referenced in the '071 patent or a portion of the bottom of that sheath, and it points to figures 1, 3, and 8, which depict the sheath. But this Court has already construed the term "surrounding bottom portion" to extend outward from the bottom of the sides of the sheath that it surrounds, and it has rejected Swissdigital's argument that the "surrounding bottom portion" can be only the bottom of the sheath itself.[5] None of the figures Swissdigital relies upon depict a portion that extends outward from the bottom of the sheath.

Second, Swissdigital points to a single embodiment in the '071 patent—figure 6—which, it says, depicts a "surrounding bottom portion" that extends outward from the bottom of the sheath. Swissdigital thinks a person of skill in the art would understand the line pointing from the image to the number 6, as shown in figure 6 below, to depict a "surrounding bottom portion." The '071 patent repeatedly states that the rectangular part of figure 6 labeled with the number 6 is a "nameplate." ECF 58-3, at 15, 16. More specifically, the specification says that in figure 6, "the

---

[5] To the extent Swissdigital relies on the expert declaration of Joel Delman submitted in opposition to the summary judgment motion to argue otherwise, that declaration was not submitted in connection with the claim construction briefing, and Swissdigital conceded at the hearing that the declaration could not be considered in connection with claim construction. ECF 78, at 79:8-11. Thus, to the extent the Delman declaration expresses opinions inconsistent with this Court's claim construction, *see, e.g.*, ECF 68, ¶¶ 60-64, the Court disregards those opinions.

power cable outlet is below the nameplate 6, and the female connector 2-2 is at the power cable

outlet." *Id.* at 15 (bolding omitted).



FIGURE 6

In support of its assertion that the rectangle identified as a "nameplate" in figure 6 would

reasonably convey a "surrounding bottom portion," Swissdigital relies on the declaration of Joel

Delman, an industrial design expert witness. *See* ECF 68. In his declaration, Delman takes figure

6 from the '071 patent and simply relabels it, putting his own label "surrounding bottom portion"

on the rectangle identified in the '071 patent as a nameplate:



FIGURE 6

*Id.* ¶ 55. And based on his own relabeling, Delman concludes that a person of skill in the art would

understand the nameplate to refer to a surrounding bottom portion. *Id.* ¶ 56.

This does not create a dispute of material fact. For one thing, Delman's conclusion that a person of skill in the art would understand the nameplate to refer to a surrounding bottom portion is conclusory. *See PowerOasis*, 522 F.3d at 1310 (expert declaration submitted on summary judgment did "not raise a genuine issue of material fact over whether the Original Application established that the inventor possessed the invention as later claimed"); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1277-78 (Fed. Cir. 2004) (expert declarations did not create a dispute of material fact on summary judgment where their declarations "contribute[d] little other than a conclusory opinion"). For another, Delman's opinion that the nameplate depicts a surrounding bottom portion is inconsistent with the words of the patent itself. The '071 patent states that, in figure 6, "the power cable outlet is *below* the nameplate 6, and the female connector 2-2 is at the power cable outlet." ECF 58-3, at 15 (emphases altered). But a "surrounding bottom portion," as described in the '137, '138, and '009 patents, refers to a portion that extends outward from the *bottom* of the sheath, which encases the female connector. Consistent with that description, the embodiments in the child patents show the surrounding bottom portion as below the female connector vis-à-vis the body, not above the female connector, as the nameplate is depicted in figure 6 of the '071 patent. *See, e.g.*, ECF 58-5, at 23, 26-28. In view of this discrepancy, no reasonable jury could conclude that a person of skill in the art would understand the nameplate in figure 6 to convey possession of a "surrounding bottom portion" as part of the '071 patent's invention.[6]

---

[6] Delman also points to another patent by the same inventor, U.S. Patent No. 9,865,153, to support his interpretation of figure 6. *See* ECF 68, ¶ 57. But another patent disclosure issued after a patent application is filed "is not evidence of what those skilled in the art considered conventional at the time the [patent] application was filed." *Application of Wertheim*, 541 F.2d 257, 264 (C.C.P.A. 1976); *see Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) ("[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably

Finally, Swissdigital contends that the "surrounding bottom portion" is inherently disclosed in the '071 patent. To demonstrate inherent disclosure, Swissdigital must show that the missing descriptive matter—here, the "surrounding bottom portion"—is "necessarily . . . present in the [original] application's specification such that one skilled in the art would recognize such a disclosure." *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1119 (Fed. Cir. 2001) (quotation marks omitted). Relying on Delman's declaration, Swissdigital contends that a "surrounding bottom portion" is necessarily present in the '071 patent specification because one skilled in the art would recognize that a surrounding bottom portion was needed to attach the waterproof sheath to the bag or luggage. But Delman's declaration does not opine that one skilled in the art would necessarily conclude that the "surrounding bottom portion" must exist as a means of attaching the sheath to the luggage. And to the extent he opines that a person of skill in the art would understand the '071 patent to disclose a "surrounding bottom portion," the declaration "does not cite in a persuasive way any supporting references" in the '071 patent application. *PowerOasis*, 522 F.3d at 1310. His opinions are far too conclusory to give rise to an issue of material fact on inherent disclosure. *See Dynacore Holdings*, 363 F.3d at 1277-78.

For these reasons, the Court concludes that that "surrounding bottom portion" limitations in the '137, '138, and '009 patents are not reasonably conveyed by the '071 patent. The '137, '138, and '009 patents are therefore entitled only to an April 19, 2019 priority date, which is the date when the "surrounding bottom portion" was first disclosed in the '137 patent.

---

conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.").

## II.    The On-Sale Bar

Having determined that the priority date of April 19, 2019 applies to the '137, '138, and '009 patents, the Court now must consider whether the contested claims are invalid under the on-sale bar set forth in 35 U.S.C. § 102. That statute "prevents a person from receiving a patent if, more than one year prior to the date of the application for patent in the United States, the invention was . . . on sale in the United States." *Quest Integrity USA, LLC v. Cokebusters USA Inc.*, 924 F.3d 1220, 1227 (Fed. Cir. 2019) (quotation marks omitted). The on-sale bar "serves as a limiting provision, both excluding ideas that are in the public domain from patent protection and confining the duration of the [patentee's] monopoly to the statutory term." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 64 (1998).

"A patent is invalid under the on-sale bar . . . if, more than one year before the application was filed, two conditions are satisfied: first, the claimed invention must be the subject of a commercial sale or offer for sale, and, second, it must be ready for patenting." *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1368 (Fed. Cir. 2007). The parties do not dispute that the claimed invention was ready for patenting, but they disagree about whether it was the subject of commercial sale before the critical date of April 19, 2018. For the claimed invention to have been the subject of a commercial sale or offer for sale, there must "have been a 'commercial offer,' and 'the invention that [wa]s the subject matter of the offer for sale must satisfy each claim limitation of the patent, though it may do so inherently." *Quest Integrity*, 924 F.3d at 1227 (quoting *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1328-29 (Fed. Cir. 2001)).

Samsonite contends that two products—Swissdigital's TSG4H157 Bag and Group III's 6067 Bag—practiced each of the contested claims in the '137, '138, and '009 patents and were the

35

subject of a commercial sale or offered for sale before April 19, 2018.[7] With respect to Swissdigital's TSG4H157 Bag, Samsonite relies on a photograph of the bag with a USB sheath in a 2015 sales brochure produced in prior litigation and a confidential design specification of a prototype produced in this litigation. *See* ECF 58-9; ECF 58-25; ECF 73, ¶¶ 81-83. The Court agrees with Swissdigital that these documents are not sufficient to demonstrate, by clear and convincing evidence, that the design specification matches the bag that was sold by Swissdigital before the critical date. Samsonite has produced no evidence, expert or otherwise, expressly linking the design document to Swissdigital's as-sold TSG4H157 Bag before April 19, 2018. Without that linkage, the Court cannot conclude that Samsonite has submitted clear and convincing evidence that the on-sale bar applies based on Swissdigital's TSG4H157 Bag, and that no reasonable jury could find otherwise. *See Eli Lilly & Co.*, 251 F.3d at 962.

With respect to Group III's 6067 Bag, Samsonite relies in part on the testimony of John Pulichino, the representative and executive chairman of Group III, in a case Swissdigital brought against Samsonite in the Western District of Texas asserting infringement of all the patents at issue in this case. *See* ECF 73, ¶¶ 90, 92-118; ECF 58-15; *Swissdigital USA Co. Ltd. v. Samsonite Int'l S.A.*, No. 6:23-cv-00196-ADA (W.D. Tex.). Pulichino, who had responsibility and oversight over Group III's product design, testified that Group III sold products with USB connectors with the following configuration: "We would mount the exterior female side . . . of the USB connector by cutting a hole through the – where – it was going to be applied either on the surface wrap or the bag itself. And we would mount it from the inside and then sew the flange to the outside fabric – you [k]now, to the exterior of the outside fabric, sew that, and then the lining on the inside would

---

[7] Specifically, Samsonite contends that Swissdigital's TSG4H157 bag practiced the claims of the '137, '138, and '009 patents and that Group III's 6067 bag practiced the claims of the '138 and '009 patents.

36

be sewn to cover up the attachment." ECF 73, ¶¶ 95-96. The USB connectors, he continued, had a "flange which the actual female connector is on, so when you're coming from the inside, you push it through an open hole. So the flange stays below the fabric, and the mounting piece, the female piece, is above the fabric on the outside. And then you would sew the fabric to the flange that's on the inside, and then on the inside you put a piece of lining fabric and that would be sewn as part of a whole inside the bag." *Id.* ¶ 97. Around 2016, Pulichino explained, Group III realized that it would be convenient to have a battery pack inside of a bag that "went through a wire connected to a female side of a USB charger, so that the consumer could have access to instant charging . . . while they're traveling." *Id.* ¶ 98. Group III "designed products around that" idea. *Id.* The first bag with this feature was Group III's 5358 bag, which was designed in 2016 and initially contained an "off-the-shelf female adaptor." *Id.* ¶ 99. From April 2017 on, Group III used what it termed an SG-X27 sheath as the port for the female connector in its products, including in the 6067 Bag, beginning in May 2017. *Id.* ¶¶ 112, 115. Group III sold 6067 Bags with the SG-X27 sheath to customers from at least September 2017 to December 2018, Pulichino explained. *Id.* ¶¶ 115-17.

Samsonite contends, and the Court agrees, that this testimony, coupled with exhibits depicting the SG-X27 sheath and its design specification, establishes by clear and convincing evidence that Group III's 6067 Bag with the SG-X27 sheath was the subject of a commercial offer before April 19, 2018, and that the bag practiced claims 1, 2, 4, 8, 17, 19, 20, and 21 of '138 and '009 patents; claim 23 of the '138 patent; and claim 29 of the '009 patent. ECF 56, at 13-17, 19-20. In response, Swissdigital does not dispute that the 6067 Bag with the SG-X27 sheath was offered for sale commercially before April 19, 2018. ECF 66, at 19-20. Nor does Swissdigital contest that the bag practiced all of the aforementioned claims of the '138 and '009 patents. *Id.* Its only argument opposing the invalidity based on the on-sale bar is that Pulichino's testimony is

self-serving because he is a longtime competitor of Swissdigital, which has previously brought suit against him. *See id.*

Mere attorney argument contesting Pulichino's credibility in sworn testimony cannot create a dispute of material fact warranting trial. *See Genuine Enabling Tech. LLC v. Sony Grp. Corp.*, 167 F.4th 1196, 1202 (Fed. Cir. 2026) ("[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsupported assertions, or only a scintilla of evidence." (quotation marks omitted)); *Welch v. Ciampa*, 542 F.3d 927, 935 (1st Cir. 2008) ("Although we give the nonmoving party the benefit of all reasonable inferences, a party cannot rest on conclusory allegations, improbable inferences, [or] unsupported speculation to defeat a motion for summary judgment." (quotation marks omitted)). Swissdigital has offered no affirmative evidence—through affidavit or otherwise—showing a material dispute over Pulichino's credibility, contesting the fact that Group III's 6067 Bag with the SG-X27 sheath was the subject of a commercial offer before April 19, 2018, or contesting that the bag practiced all of the aforementioned claims. *See Anderson*, 477 U.S. at 256-57. And its response to the portions of Samsonite's statement of undisputed facts regarding the content of Pulichino's testimony states only that Swissdigital questions Pulichino's veracity because his company is a competitor to Swissdigital. *See* ECF 73, ¶¶ 92-117. This is not sufficient to defeat summary judgment. *See Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1366 (Fed. Cir. 2014) (rejecting argument that summary judgment was inappropriate because "serious questions undermining the reliability and accuracy of [an online posting] should have been submitted to the jury,'" where the plaintiff "present[ed] no affirmative evidence challenging the . . . material facts" concerning the posting and the author of the posting authenticated it).

Absent any affirmative evidence contesting Pulichino's sworn testimony that the Group III 6067 bag with the SG-X27 sheath practiced the contested claims and was commercially offered

38

before April 19, 2018, no reasonable jury could reject the applicability of the on-sale bar to those claims. Accordingly, claims 1, 2, 4, 8, 17, 19, 20, 21 of the '138 and '009 patents; claim 23 of the '138 patent; and claim 29 of the '009 patent are invalid under the on-sale bar of 35 U.S.C. § 102. Samsonite is entitled to summary judgment on Swissdigital's claims of infringement as to those contested claims in the '138 and '009 patents.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, the Court concludes that the preambles of the asserted patents are not limiting; it construes the terms "an outer surface of [the/a] body," "fixedly attached," and "adjacent to the [power cable outlet/first port]" to have their plain and ordinary meaning; it construes the term "the outer surface of the bag or luggage body" to mean "the outermost surface of the bag or luggage body"; and it construes the term "surrounding bottom portion" to mean "a portion that extends outward from the bottom of." Samsonite's partial motion for summary judgment, ECF 56, is GRANTED with respect to Swissdigital's infringement claims as to claims 1, 2, 4, 8, 17, 19, 20, 21 of the '138 and '009 patents; claim 23 of the '138 patent; and claim 29 of the '009 patent. Samsonite's motion is otherwise DENIED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: March 27, 2026

39